# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

GEORGE REED,

                              Plaintiff,

v.                                                      Case No. 15-CV-208-JPS

WARDEN PAUL KEMPER and
MICHELLE BONES,

                              Defendants.                    ORDER

In this action under 42 U.S.C. § 1983, the plaintiff, George E. Reed ("Reed"), claims that the defendants violated his constitutional right to marry under the Fourteenth Amendment.[1] (*See generally* Docket #1, Ex. 2). Reed argues that he complied with all of the legal and policy conditions set forth by the Department of Corrections' ("DOC") marriage policy, and was approved to proceed with his union by the Racine Correctional Institution's marriage coordinator, Chaplain Reotha Cole. (Docket #38 ¶ 24). However, the Warden, Paul Kemper ("Kemper"), denied Reed's application based on Reed's criminal history, sentence structure, and programming needs. (*See* Docket #38 ¶¶ 24-29 ). Kemper argues that his decision was rooted in concerns for public safety. (Docket #38 ¶¶ 19-21). Michelle Bones ("Bones"), on the other hand, is the Institution Complaint Examiner at the Racine Correctional Institution. (Docket #38 ¶ 4). Reed claims that Bones violated his

---

[1] In the plaintiff's summary judgment filings, he also suggests that his right to marry is protected by the First and/or Eighth Amendments. (*See* Docket #28 at 1; Docket #29 ¶ 1). Though the Court's screening Order did not explicitly state under which constitutional provision the plaintiff's claim arose (*see* Docket #8 at 3), the Court made clear that an inmate's constitutional right to marry was established in *Turner v. Safley*. 482 U.S. 78, 89 (1987). As *Turner* rested on an interpretation of the Due Process Clause, the plaintiff's constitutional claims in this case will be interpreted as ones arising under the Fourteenth Amendment. 482 U.S. at 84.

Fourteenth Amendment rights by failing to properly investigate Reed's administrative complaint. (Docket #1, Ex. 2 at 4). Bones denies any constitutional wrongdoing. (Docket #37). Both Kemper and Bones claim that they are entitled to qualified immunity. (Docket #37).

On February 24, 2015, Reed filed this action asking the Court to: (1) enter an injunction[2] that orders Kemper to permit Reed's marriage; and (2) order that both of the defendants pay damages for the harms that Reed has allegedly suffered since Kemper denied the marriage application in question. (Docket #1, Ex. 2 at 5). On October 6, 2015, the plaintiff moved for summary judgment under Federal Rule of Civil Procedure 56 on all claims against the defendants.[3] (Docket #27). That motion is now fully briefed and ripe for adjudication.

1.      BACKGROUND

The facts in this case are largely undisputed.[4] Reed has been housed at the Racine Correctional Institution ("Racine") since April 21, 2011. (Docket #38 ¶ 1). Kemper is the Warden at Racine, and has held that position since December 30, 2012. (Docket #38 ¶ 3). Bones is the Institution Complaint Examiner at that facility. (Docket #38 ¶ 4).

---

[2]Reed's complaint is not entirely clear as to the form of relief he seeks from the defendants. (*See* Docket #1, Ex. 2 at 5). However, the Court finds that the claims and relief described herein best reflect the requests made in Reed's complaint and summary judgment filings. (*See* Docket #1, Ex. 2 at 5; Docket 28 at 3).

[3]The defendants did not file a motion for summary judgment. (*See* Docket #37).

[4]The facts are taken from the parties' proposed findings of fact, unless otherwise indicated. (*See* Docket #29, #38). Where the parties dispute, or object to, the other's findings of fact, the Court will so note.

## 1.1 The Marriage Policy

Division of Adult Institutions Policy and Procedure #309.00.06 ("DAI 309.00.06") guides decision-making regarding inmate marriages. (Docket #38 ¶ 5). Pursuant to DAI 309.00.06, an inmate may request to marry while incarcerated if the following conditions are met:

a.  The marriage does not pose a threat to the security of the institution/center or a threat to the safety of the public;

b.  There are no legal impediments to the marriage;

c.  The inmate is not scheduled for release within nine months;

d.  The proposed spouse or the proposed spouse's children are not victims of the inmate;

e.  The proposed spouse has never been convicted in any criminal activity with the inmate; and

f.  The proposed spouse has been on the inmate's visiting list for a minimum of one year.

(Docket #38 ¶ 6). Satisfaction of all of these requirements does not guarantee that the marriage request will be approved. (Docket #38 ¶ 22).

In order to initiate the application process, the inmate is responsible for submitting the DOC-1671 Request for Marriage form ("DOC-1671") to the institution. (Docket #38 ¶ 7). The inmate is also required to meet with institution staff for an interview and investigation, which includes a review of the request to marry and an explanation of DAI 309.00.06. (Docket #38 ¶ 7). During the interview, the inmate and proposed spouse must provide documentation of any judgments (divorce, annulment, etc.) or death certificates, as defined in Wisconsin Statutes, and evidence of account balances to cover estimated expenses. (Docket #38 ¶ 7).

An inmate seeking to be married must also meet the financial responsibilities and legal requirements set forth in DAI 309.00.06(II) and (III). (Docket #38 ¶ 8). This includes the inmate bearing all financial obligations

associated with pre-marital counseling, the marriage, and any staff overtime or fringe benefits. (Docket #38 ¶ 8).

Lastly, it is the responsibility of the inmate to review and ensure that all legal requirements of marriage are met. (Docket #38 ¶ 8). An inmate may only marry in the prison in which he is incarcerated. (Docket #38 ¶ 8).

For each proposed marriage, the marriage coordinator, who at all times relevant at Racine was Chaplain Reotha Cole[5] ("the chaplain"), is responsible for reviewing inmate files and making recommendations to the warden on the appropriateness or legality of the proposed marriage. (Docket #38 ¶ 14). In particular, the chaplain is responsible for sending the intended spouse a letter including the following information:

a.  The inmate's name of commitment and any aliases;
b.  The inmate's current and previous committing offenses;
c.  The inmate's length of sentence;
d.  The inmate's projected release from prison if available; and
e.  Any other information on prior criminal convictions about the inmate, such as domestic abuse, that the coordinator believes is appropriate that will aid the intended spouse in making an informed decision.

(Docket #38 ¶ 15). The chaplain is also responsible for:

a.  Supplying the DOC-1671 form to the inmate upon request;
b.  Interviewing the inmate;
c.  Forwarding the DOC-1671 form to the inmate's social worker;
d.  Arranging for or conducting pre-marital counseling;
e.  Ensuring requirements for pre-marital counseling are met;
f.  Notifying the warden of the inmate's completion of counseling;

---

[5] Pursuant to Racine's Facility Procedure for DAI 309.00.06, Kemper designates staff to complete the functions of DAI 309.00.06 and to submit recommendations and reasons to the chaplain for approval/denial of marriage. (Docket #38 ¶ 10). At Racine, these designated staff include the chaplain, the unit social worker, the inmate's agent, and Kemper. (Docket #38 ¶ 11).

g.   Scheduling a multi-disciplinary meeting with the intended spouse (if applicable);

h.   Forwarding completed documentation to the warden; and

i.   Notifying the inmate of the warden's decision.

(Docket #38 ¶ 17).

Thereafter, the warden takes over the application process.[6] (Docket #38 ¶ 9). Ultimately, it is his/her responsibility to approve the DOC-1671 form, counseling plans, marriage, and wedding arrangements. (Docket #38 ¶ 9).

Once the chaplain forwards the appropriate paperwork, the warden reviews the marriage request. (Docket #38 ¶ 19). At Racine, when reviewing a marriage request, Kemper claims that he takes into consideration the information contained in the DOC-1671 and DOC-1673 forms. (Docket #38 ¶ 19). Kemper also states that he considers the inmate's criminal history, sentence structure, and programming needs.[7] (Docket #38 ¶ 19). If the warden does not approve a marriage, the reasons for denial are provided in writing. (Docket #38 ¶ 9).

1.2    Reed's Request to Marry

On or about February 21, 2014, Kemper received: (1) Reed's request to marry his fiancé, Jerusha Bohannon ("Bohannon"); and (2) a memorandum

---

[6]The Court notes that there is no section of DAI 309.00.06 specifically dedicated to providing the warden guidance on his/her decision to grant or deny a marriage request, seemingly leaving the warden with unfettered discretion. (*See* Docket #41, Ex. 1 at 2). In other words, the DAI policy does not mandate which—if any—factors the warden must consider in evaluating an inmate's marriage request. (*See generally* Docket #41, Ex. 1). However, as Reed does not assert a facial challenge to the marriage application and approval procedure, the Court will not address whether DAI 309.00.06 passes facial constitutional scrutiny.

[7]Neither the inmate's criminal history, sentence structure, nor programming needs are referenced in the DAI policy. (*See generally* Docket #41, Ex. 1).

from the chaplain which indicated that Reed had met all legal and policy conditions under DAI 309.00.06 for marriage. (Docket #38 ¶ 24). However, for reasons related to Reed's criminal history, sentence structure, and programming needs (Docket #38 ¶¶ 26-29), Kemper denied Reed's marriage request on July 25, 2014 (Docket #38 ¶ 30).

After Kemper denied Reed's application, Reed filed an inmate complaint against Kemper. (Docket #38 ¶ 24). Upon review, Bones recommended the complaint be dismissed, finding that Kemper's decision did not violate a DOC and/or Racine policy. (Docket #38 ¶¶ 32, 35). Bones also reported that, per DAI 309.00.06(I)(F), the proposed spouse must have been on the inmate's visitor list for a minimum of one year. (Docket #38 ¶ 36). Despite the chaplain's previous conclusion that "[a]ll [of Reed's] legal and policy conditions of marriage according to DOC-1671" were satisfied (Docket #40, Ex. 1 at 21) and, despite the fact that Kemper made no mention of the issue, Bones noted that Bohannon had only been on Racine's visitor's list since September of 2013[8] (Docket #40, Ex. 1 at 2). Kemper thereafter affirmed Bones' decision to dismiss Reed's complaint. (Docket #38 ¶¶ 32, 37). Though Reed appealed this decision, Reed's appeal was also dismissed on October 14, 2014. (Docket #38 ¶ 41).

On February 24, 2015, Reed filed this action against the defendants (*see* Docket #1), and the case now comes before the Court on the plaintiff's motion for summary judgment (Docket #27).

---

[8]Because Kemper did not consider Bohannon's visitation record in making his decision to deny Reed's marriage request, and the parties did not argue the import of that fact in their summary judgment filings, the Court will not address the issue herein. Moreover, as it currently appears that Bohannon has been on the visiting list at Racine for well over a year, while Kemper still refuses to grant Reed's request to marry, the issue is factually moot .

Case 2:15-cv-00208-JPS   Filed 12/17/15   Page 6 of 24   Document 55

## 2.    LEGAL STANDARD

When a party files a motion for summary judgment, it is their "contention that the material facts are undisputed and the movant is entitled to judgment as a matter of law." *Hotel 71 Mezz Lender LLC v. Nat. Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015) (citing Fed. R. Civ. P. 56(a))."Material facts" are those facts which "might affect the outcome of the suit," and "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, to have a genuine dispute about a material fact, a party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 474 U.S. 574, 586 (1986); namely, the party in opposition "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

"Where…the movant is seeking summary judgment on a claim as to which it bears the burden of proof, it must lay out the elements of the claim, cite the facts it believes satisfies these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claims." *Hotel 71 Mezz*, 778 F.3d at 601. In analyzing whether summary judgment should be granted, a court must draw all reasonable inferences from the materials before it in favor of the non-moving party. *Id.* When a court denies a motion for summary judgment, it "reflects the court's judgment that one or more material facts are disputed or that the facts relied on by the motion do not entitle the movant to judgment as a matter of law." *Id.* at 602.

3.    ANALYSIS

Reed claims that the undisputed facts show that the defendants violated his Fourteenth Amendment right to be married. (*See generally* Docket #1, Ex. 2). As such, Reed claims that he is entitled to summary judgment granting him: (1) an injunction that orders Kemper to approve of his marriage; and (2) an award of damages against both of the defendants for the harm that they have caused. (*See* Docket #1, Ex. 2 at 5). On the other hand, the defendants deny liability and claim that they are immune from a suit for damages under the doctrine of qualified immunity. (*See generally* Docket #37).

As described more fully below, the Court finds that Reed is entitled to summary judgment on his claim for injunctive relief against Kemper. But, because both Kemper and Bones are entitled to qualified immunity, Reed's claims for damages against them will be dismissed.

3.1    Injunctive Relief Against Kemper

"Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner*, 482 U.S. at 84. In particular, "[t]he Constitution protects a prisoner's fundamental right to marry; individuals do not lose this constitutional protection simply because they are imprisoned." *Riker v. Lemmon*, 798 F.3d 546, 551 (7th Cir. 2015) (citing *Turner*, 483 U.S. at 94-96; *see also Obergefell v. Hodges*, 135 S. Ct. 2584, 2598 (2015) (recognizing that "[o]ver time and in other contexts, the Court has reiterated that the right to marry is fundamental under the Due Process Clause"). "[W]hen a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights." *Turner*, 483 U.S. at 84 (internal citations omitted).

However, "[i]t is settled that a prison inmate 'retains those [constitutional] rights that are not inconsistent with his status as a prisoner

or with the legitimate penological objectives of the corrections system.'" *Id.*
(citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974)). Courts adhere to a four-
factor test to evaluate the constitutionality of prison regulations:

> (1) whether a valid, rational connection exists between the
> regulation and a legitimate government interest behind the
> rule; (2) whether there are alternative means of exercising the
> right in question; (3) what impact accommodation of the
> asserted constitutional right would have on guards, other
> inmates, and on the allocation of prison resources; and (4) what
> easy alternatives exist to the regulation because, although the
> regulation need not satisfy a least restrictive alternatives test,
> the existence of obvious alternatives may be evidence that the
> regulation is not reasonable.

*Shimer v. Washington*, 100 F.3d 506, 509 (7th Cir. 1996) (citing *Turner*, 483 U.S.
at 89-90). In applying this test, "a regulation cannot be sustained where the
logical connection between the regulation and the asserted goal is so remote
as to render the policy arbitrary or irrational." *Riker*, 798 F.3d at 553 (internal
citations omitted) (finding that a prison's unsubstantiated concerns regarding
institutional safety precluded summary judgment for the defendants in a
case where a former prison employee challenged the facility's decision to
prohibit her marriage to an inmate).

    "Although the burden of persuasion is on the prisoner to disprove the
validity of a regulation, prison officials must still articulate their legitimate
governmental interest in the regulation and provide *some evidence* supporting
their concern." *Id.* (internal citations omitted) (emphasis added); *see also
Beerheide v. Suthers*, 286 F.3d 1179, 1189 (10th Cir. 2002) ("In order to warrant
deference, prison officials must present credible evidence to support their
stated penological goals."). Nonetheless, courts "must accord substantial
deference to the professional judgment of prison administrators, who bear
a significant responsibility for defining the legitimate goals of a corrections

Case 2:15-cv-00208-JPS   Filed 12/17/15   Page 9 of 24   Document 55

system and for determining the most appropriate means to accomplish them." *Riker*, 798 F.3d at 553 (internal citations omitted) (internal quotation marks omitted).

Here, Reed argues that the undisputed facts show that Kemper arbitrarily denied Reed's marriage application. (*See generally* Docket #28). In so doing, according to Reed, Kemper violated Reed's due process rights, thus entitling him to judgment as a matter of law. (*See generally* Docket #28). On the other hand, the defendants argue that Kemper's reliance on Reed's criminal history, sentence structure, and unmet programming needs to deny Reed's marriage request was rational and lawful. (*See generally* Docket #37). Though it is ultimately Reed's burden to prove that Kemper's decision under DAI 309.00.06 was invalid, the defendants must nonetheless put forth "some evidence" tending to show that Kemper's decision was rationally related to a legitimate governmental interest under the first, threshold prong of the Court's four-factor analysis. *See Riker*, 798 F.3d at 553. The Court finds that the defendants have not met that burden because none of the defendants' asserted bases for Kemper's decision are rationally related to a legitimate penological goal.

### 3.1.1   Reed's Criminal History

First, Kemper claims his consideration of Reed's criminal history was proper because it "illustrates [Reed's] background" and because "it is [Kemper's] job to look out for the best interests of Reed's fiancé and family." (Docket #41 ¶ 20; Docket #37 at 6-7). In this case, Kemper claimed that Reed's drug and first degree homicide convictions were "very serious felon[ies]" (Docket #41 ¶ 26) that "could have a negative effect on his relationship with [Reed's] fiancé and family" (Docket #37 at 7).

As a preliminary matter, the Court notes that the defendants are inconsistent in their explanation of why Kemper considers criminal history when evaluating a marriage application in the first instance.[9] Nonetheless, taking the facts most favorable to the defendants, we will assume that Kemper's proffered concern for public safety is a legitimate penological goal under DAI 309.00.06.[10] (*See* Docket #41, Ex. 1 at 1-2). The Court concludes, however, that Kemper's consideration of Reed's criminal history was not rationally related to public safety. Three justifications underlie the Court's conclusion.

First, as the defendants point out numerous times in their filings, Reed is currently serving a life sentence without parole. (Docket #38 ¶ 27). Thus, it appears that Reed will never interact with Bohannon and his family outside the careful scrutiny of correctional staff. It is puzzling, indeed, to imagine how Reed might affect the safety of Bohannon, their family, or any other member of the public because the inmate's right to marry under the

---

[9]On the one hand, in Kemper's declaration, he claims that criminal history is relevant because it helps him assess the "impact…[on] the relationship with the proposed wife and family." (Docket #41 ¶ 20). On the other hand, in their brief, the defendants argue that criminal history is relevant in assessing a proposed marriage's effect on "public safety." (Docket #37 at 7). With this in mind, the Court notes that no where in DAI 309.00.06 is the warden's assessment of the "impact" of a marriage on the proposed spouse and family listed as a procedural, financial, legal, or other requirement. (*See* Docket #41, Ex. 1 at 1-2). Moreover, the Court would be remiss in failing to point out that assessing marital "impact" seems a more appropriate task for the professionals who conduct the counseling sessions mandated by DAI 309.00.06. (Docket #41, Ex. 1 at 1-2).

[10]The Court acknowledges that this argument assumes that the protection of public safety, as outlined in DAI 309.00.06, is a legitimate goal of the DOC marriage policy. (*See* Docket #41, Ex. 1 at 1). The constitutionality of this policy goal under DAI 309.00.06 has not been challenged in this case and, as such, the Court does not herein opine on the issue.

Fourteenth Amendment does not guarantee the inmate the right to conjugal visits or even visitations in general. *See Kentucky Dep't of Corrs. v. Thompson*, 490 U.S. 454, 460 (1989) (no due process right to unfettered visitation); *Block v. Rutherford*, 468 U.S. 576, 585–88, (1984) (pretrial detainees have no constitutional due process right to contact visits); *Saleem v. Helman*, 124 F.3d 205, 205 (7th Cir. 1997) (no constitutional right to conjugal visits). Moreover, incoming and outgoing prisoner mail can be inspected for contraband and on a spot-check basis for escape plans or other threats to jail security. *See Gaines v. Lane*, 790 F.2d 1299, 1304 (7th Cir. 1986) (citing *Smith v. Shimp*, 562 F.2d 423 (7th Cir. 1977)). In this context, Kemper's safety concerns about the public and/or Bohannon are, at best, theoretical and, at worst, factually absurd.

Second, the Supreme Court has declared that the right of persons, including inmates, to marry is "fundamental" under the Fourteenth Amendment. *See Obergefell*, 135 S. Ct at 2589; *Turner*, 482 U.S. at 87. The Supreme Court, when articulating this right with respect to inmates, did not qualify that the right only applied to certain prisoners with less "violent" convictions (whatever that means) and not to others. *See Turner*, 482 U.S. at 96; *see also Obergefell*, 135 S. Ct at 2594 ("The lifelong union of a man and a woman always has promised nobility and dignity to all persons, without regard to their station in life."). Certainly, the Supreme Court justices were aware, in announcing *Turner*, that inmates with potentially "violent" backgrounds would be affected by its ruling. Nonetheless, in broad and clear terms, the Court declared that the "incidents of marriage, like the religious and personal aspects of the marriage commitment, are unaffected by the fact of confinement…." *Turner*, 482 U.S. at 96.

Third, case law supports the Court's conclusion. To be sure, even fundamental constitutional rights of prisoners can be substantially restricted as a result of incarceration. *Id.* For example, in *Keeney v. Heath*, the Seventh Circuit held that an "antifraternization" rule that prevented employees from "becoming involved socially with inmates" was rationally related to preventing the transfer of unlawful communication and favoritism in the jail. 57 F.3d 579, 581 (7th Cir. 1995). The court concluded that the regulation only imposed a minimal burden on the plaintiff because the defendants did not completely forbid the plaintiff from marrying her fiancé; instead, the prison merely prohibited the plaintiff from continuing to work at the prison if she chose to go forward with the marriage. *Id.* Similarly, in *Martin v. Snyder*, the court found that qualified immunity was appropriate when a prison official delayed an inmate's marriage because his fiancé had been placed on a restricted list, which in turn prevented her from visiting the prison. 329 F.3d 919, 920 (7th Cir. 2003). The *Martin* opinion reiterated that "[r]estrictions on visitation, though not enough to justify prohibiting marriage, may well justify deferment, so that the sanction for misconduct will have some sting." *Id.* at 922.

On the other hand, where prison administrators cannot put forth some evidence to show how their policy or regulation is rationally related to a legitimate goal, the Seventh Circuit has been clear that courts may not blindly stamp a prison policy with the seal of judicial approval. For example, in *Riker*, the Seventh Circuit reversed and remanded a grant of summary judgment for prison administrators who had denied a former prison employee's request to marry an inmate. *Riker*, 798 F.2d at 548. As in *Keeney*, the defendants argued that the prison's security interest would be comprised by permitting a marriage between a former employee and a current inmate.

*Id.* at 556. However, the Court rejected that theory, finding that nothing in the record supported the defendants' theory that a one-time request to enter the prison to be married implicated the same security concerns as a general visitation privilege. *Id.* The defendants likewise put forth no evidence to support their position that the decision to deny the plaintiff's marriage deterred other DOC staff from entering into "inappropriate relationships." *Id.* at 557. Thus, because there was simply "no evidence in the record supporting the Department's contention that prohibiting Ms. Riker's marriage [was] necessary to ensure a safe and orderly institution," the prison policy did not pass muster under *Turner. Id.*

What Seventh Circuit case law reveals, then, is that in determining the threshold factor under *Turner*, the defendants "must present evidence demonstrating a specific" penological concern "that bears a nexus to the prohibited conduct," here, Reed's marriage. *Id.* As Reed's criminal history bears no nexus to public safety under the facts presented, the defendants have failed to meet that burden. *Cf. Shimer*, 100 F.3d at 510 ("The prison administration cannot avoid court scrutiny by reflexive, rote assertions.") (internal citations omitted) (internal quotation marks omitted). Like the plaintiff in *Riker*, Reed has been left with no alterative means of exercising his right to marry Bohannon. *See Riker*, 798 F.3d at 556 (finding that without any alternative means of exercising the right to marry "it is clear that the burden on that right [i]s not minimal"); *cf. Turner*, 482 U.S. at 90 ("[W]here other avenues remain available for the exercise of the asserted right, courts should be particularly conscious of the measure of judicial deference owed to corrections officials…in gauging the validity of the regulation."). Thus, the Court finds that Reed's criminal history was not rationally related to the

protection of public safety in the context of deciding whether to approve his marriage application.

### 3.1.2    Reed's Sentence Structure

The second proffered justification for denying marriage application in dispute was Reed's sentence structure. (*See* Docket #38 ¶ 29). The Court likewise finds that Reed's sentence structure was not rationally related to a legitimate penological aim.

The defendants submit that Reed's life sentence caused Kemper to "question[] how [Reed] could truly provide care and support for his fiancé when he will remain incarcerated for the rest of his life." (Docket #38 at 7). In addition, Kemper asserts that he "considered what role Reed could/will play in the life of his proposed spouse if he is incarcerated for the remainder of his life" and "questioned whether he could provide for her and support her in times of crisis." (Docket #38 ¶ 29). Kemper also claims that he "questioned whether a marriage under these circumstances could be successful" and "believed it was irresponsible to approve this marriage for fear it would only create another divorce.…" (Docket #38 ¶ 29).

The Court is troubled by a number of aspects of this argument. First, and most importantly, it is entirely unclear how Reed's life-sentence has any relation to the defendants' proffered goal of ensuring public safety. (Docket #38 at 7). Rather, what Kemper's declaration and the defendants' brief reveal is that Kemper's consideration of sentence structure was rooted in concerns about Reed's ability to "provide care and support" for Bohannon. (Docket #37 at 7; Docket #38 ¶¶ 21, 29). This justification, however, rests on a baseless premise: that Reed, as a function of his incarceration, cannot "care [for] and support" a spouse from prison. (Docket #37 at 7; Docket #38 ¶¶ 21, 29).

The Supreme Court has gone to great lengths to emphasize the transcendent significance of marriage, thereby eliminating Kemper's "question" that an inmate such as Reed could participate in such a caring and supportive union. The rite of marriage in and of itself is an "expression[] of emotional support and public commitment." *Turner*, 482 U.S. at 96. Moreover, "marriage is sacred to those who live by their religions and offers unique fulfillment to those who find meaning in the secular realm." *Obergefell*, 135 S. Ct at 2594. "[T]herefore, the commitment of marriage may be an exercise of religious faith as well as an expression of personal dedication." *Turner*, 482 U.S. at 97.

Regardless of one's religious views on the import of marriage, the "abiding connection between marriage and liberty" reveals that the marital bond is inextricably linked to an individual's identity and personal dignity. *See Obergefell*, 135 S. Ct. at 2594 ("[Marriage] fulfils yearnings for security, safe haven, and connection that express our common humanity...and the decision whether and whom to marry is among life's momentous acts of self-definition.") (internal citations omitted). Marital status is also the key to an otherwise inaccessible "constellation" of benefits and entitlements. *Id.* at 2601. For example, marriage permits "the receipt of government benefits (e.g., Social Security benefits), property rights (e.g., tenancy by the entirety, inheritance rights), and other, less tangible benefits (e.g., legitimation of children born out of wedlock)." *Turner*, 482 U.S. at 96.

In this case, it is precisely because of these intangible and spiritual benefits of marriage that Reed applied to be married in the first place. (*See generally* Docket #29). Reed and Bohannon have a child, Haneesia, together. (Docket #29 at 2, 8). Reed explains that he and Bohannon have "discussed the matter between themselves" (Docket #44 at 3) and nonetheless seek to be

married "on behalf of their children and in their [own] best interests [sic]." (Docket #29 at 8; Docket #44 at 3). Moreover, Reed reiterates his view that marriage carries a spiritual value because "God…instituted marriage as[sic] a sacred covenant…." (Docket #29 at 12). Thus, it is clear, under the binding law on this Court, that the "bilateral loyalty" that Reed and Bohannon seek, and that only civil marriage can legitimize, transcends the prison walls that separate Reed from Bohannon. *Griswold v. Connecticut*, 381 U.S. 479, 486 (1965). The Court cannot endorse Kemper's arbitrary denial of that right.

In addition, the connection between Reed's ability to be a "provider" from prison and the defendants' proffered justification of public safety, seems tenuous, if not entirely inconsequential. If the ability of prisoners to "provide" for their non-incarcerated spouses was a legitimiate basis upon which to deny a marriage petition, it is difficult to imagine which, if any, prisoner marriage applications would be approved. Moreover, this argument obviates the current reality, which is that Bohannon is surviving in the world without Reed having to "provide" for her. There is nothing in the record to suggest that Bohannon would be going into this marriage with anything other than her eyes wide open. There is no rational reason for Kemper to think or otherwise conclude that Bohannon's ability to survive, live, and support her children without Reed would be negatively, if at all, affected by the marriage.

Therefore, the Court finds that Kemper's conclusion with respect to Reed's sentence structure's effect on public safety was irrational.

### 3.1.3    Reed's Programming Needs

The final justification that Kemper provided in denying Reed's marriage request was Reed's alleged unmet programming needs.[11] (Docket #41 ¶ 29). The defendants' brief[12] suggests that Kemper considers programming needs for "rehabilitative" and "public safety" purposes. (Docket #38 at 7).

The Court finds that Kemper's conclusion with regard to Reed's unmet programming needs was not rationally related to a legitimate government interest. First, nowhere in DAI 309.00.06 is "rehabilitation" and/or "programming needs" listed as a procedural, financial, legal, or other requirement to marry. (*See* Docket #41, Ex. 1 at 1-2). Moreover, Reed points out that he has completed "Spiritual Foundations in AODA Recovery." (Docket #44 at 5; Docket #45, Ex. 3). Reed explains that the only outstanding AODA programming on his record is a "residential" program which has been discontinued at Racine since March 9, 2012. (Docket #44 at 5; Docket #45, Ex. 4; *see also* Docket #40, Ex. 2 at 31). The documents that the defendants produced likewise confirm that the only AODA program that the plaintiff has not completed corresponds to the discontinued AODA residential program. (*See* Docket #40, Ex. 2 at 31).

_____

[11]Kemper asserts, in his declaration, that Reed's "Classification Action reports" revealed that Reed made a statement in which he expressed the belief that he was innocent of his crimes and was not the triggerman of his homicide conviction. (Docket #41 ¶ 28). It is not clear how, or whether, this fact affected Kemper's decision to deny Reed's marriage application and, as such, the Court will not address it in detail.

[12]Nowhere in Kemper's declaration (Docket #41) or the defendants' findings of fact (Docket #38) do the defendants discuss why Kemper reviews programming needs in the context of marriage applications.

Moreover, even assuming that Reed did have an unmet programming need, the Court finds that there was no rational basis to deny Reed's marriage request on the basis of Reed's AODA programming. The defendants fail to point out how unmet programming needs for an inmate—who is currently slated to live out the rest of his life in prison—would affect the public's safety. As the defendants fail to provide further argument or facts to support their position, the Court finds that the defendants' reliance on Reed's programming needs in denying his marriage application was irrational.

### 3.1.4  *Turner* Factors

Likewise, the other relevant factors under *Turner*—including whether there are alternative means for Reed to exercise the right in question and what impact accommodating Reed's constitutional right would have—support the Court's conclusion that Kemper's decision was unreasonable. *Turner*, 483 U.S. at 89-90. Though accommodating Reed's marriage request would impose some burden on prison staff to coordinate the event, there is no alternative manner for Reed to be married other than that procedure which is outlined in DAI 309.00.06. Without Kemper's permission, Reed will not be permitted to wed so long as he is housed at Racine. Thus, in balancing the burden on Reed's constitutional right to marry, which is significant, against the defendants' proposed justifications for Kemper's decision, the Court finds that Reed's right to marry under the Fourteenth Amendment was violated.

In sum, the undisputed facts show that there was no rational relationship between Kemper's decision to deny Reed's marriage application and a legitimate penological goal. Thus, the Court will grant Reed judgment

as a matter of law with respect to his claim for injunctive relief against Kemper.

### 3.2    Kemper and Bones are Entitled to Qualified Immunity

Notwithstanding Reed's claim for injunctive relief against Kemper, the defendants argue that they are entitled to qualified immunity from damages[13] flowing from this action because "it is not 'beyond debate' " under the case law that they "violated Reed's rights to marry." (Docket #37 at 8-9). The Court agrees.

"Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officers from harassment, distraction, and liability when they perform their duties reasonably." *Abbott v. Sangamon Cty., Ill.*, 705 F.3d 706, 713 (7th Cir. 2013) (citing *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). Likewise, "[i]t gives public officials breathing room to make reasonable but mistaken judgments about open legal questions." *Id.* (internal citations omitted) (internal quotation marks omitted). When properly applied, the doctrine protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Whether a defendant is entitled to qualified immunity is a question of law. *Llaguno v.*

---

[13]To be clear, the defense of qualified immunity does not apply to the injunctive relief that Reed's seeks. *Harlow*, 457 U.S. at 818; *see also Zastrow v. Pollard*, No. 11-C-371, 2013 WL 1288040, at *6 (E.D. Wis. Mar. 26, 2013).

*Mingey*, 763 F.2d 1560, 1569 (7th Cir. 1985), *cert. dismissed*, 478 U.S. 1044 (1986).

Determining the applicability of qualified immunity involves a two-part analysis. *Saucier v. Katz*, 533 U.S. 194, 199 (2001). First, the court must decide whether, "[t]aken in the light most favorable to the party asserting the injury, the facts alleged show the officer's conduct violated a constitutional right." *Id.* at 201. Second, "the court must determine whether the right at issue was clearly established at the time of defendant's alleged misconduct." *Pearson*, 555 U.S. at 232. The Court is "permitted to exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236.

In this case, the Court will exercise its discretion to analyze the second prong of the qualified immunity analysis first. To determine whether a right is clearly established, the Court must look to precedent "to determine whether there was such a clear trend in the case law that [the Court] can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time." *Abbott*, 705 F.3d at 731 (internal citations omitted). "The inquiry into whether a right is clearly established 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Borello v. Allison*, 446 F.3d 742, 750 (7th Cir. 2006) (citing *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)). Though "it is not necessary for the particular violation in question to have been previously held unlawful," *Bd. v. Farnham*, 394 F.3d 469, 477 (7th Cir. 2005), "[a] plaintiff is required to show that a violation of that right has been found in factually similar cases, or that the violation was so clear that an official would realize he or she was violating an inmate's constitutional rights even in the absence

of an on-point case." *Borello*, 446 F.3d at 750. A state official "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in his shoes would have understood that he was violating it, meaning that existing precedent...placed the statutory or constitutional question beyond debate." *Kingsley v. Hendrickson*, 801 F.3d 828, 832 (7th Cir. 2015) (citing *City & Cty. of San Francisco, Cal. v. Sheehan*, 135 S.Ct. 1765, 1774 (2015)).

Under these standards, the Court finds that the contours of an inmate's right to marry was not sufficiently defined such that any reasonable official in the defendants' shoes would have understood that it was unconstitutional to deny Reed's request to marry. *Id.* As discussed at length above (*see supra* Part 3.1), the inmate's right to marry is one that is subject to "substantial restriction." *Turner*, 483 U.S. at 89. Though *Turner* was decided over sixteen years prior to Kemper's decision, the courts applying *Turner*, including the Seventh Circuit, have done so in a highly fact-specific manner. *See e.g.*, *Martin*, 329 F.3d at 922 (holding that qualified immunity was appropriate because "*Turner* does not say that every delay violates the Constitution"); *Zastrow v. Pollard*, No. 11-C-371, 2013 WL 1288040, at *6 (E.D. Wis. Mar. 26, 2013) ("[C]ase law still does not provide an unambiguous answer as to whether requiring marriage counseling as a precondition to a prisoner's marriage violates the Constitution.").

Moreover, the Seventh Circuit, in addressing a marriage regulation within the context of a qualified immunity claim, has been clear that "[a]lthough *Turner* clarifies the right to marry retained by prisoners, it does not define what regulations would be reasonably related to penological interests." *Williams v. Shettle*, 914 F.2d 260 (7th Cir. 1990). Neither the Supreme Court nor Seventh Circuit case law have indicated that it is

"beyond debate" that considering criminal history, sentence structure, and programming needs in the name of public safety is unconstitutional when reviewing a marriage request. *Kingsley*, 801 F.3d at 832. Thus, this Court cannot fairly say that the defendants' actions were "plainly incompetent" or that the defendants "knowingly violate[d] the law." *Malley*, 475 U.S. at 341.

As such, the defendants are entitled to qualified immunity and Reed's claims for damages against Kemper and Bones[14] will be dismissed.

4.     CONCLUSION

The Court finds that the undisputed facts show that Kemper's decision to deny Reed's marriage request was not rationally related to a legitimate penological aim. Thus, Reed is entitled to summary judgment on his claim for injunctive relief against Kemper. However, since the contours of an inmate's right to marry were not so clearly established that a reasonable person would have known that the right was being violated by the defendants' actions, the defendants are entitled to qualified immunity on Reed's claims for damages against them.

Finally, the Court notes that Reed has filed for default judgment and three trial-related motions in this case. (*See* Docket #42, #49, #50, #53). Each of these motions will be denied as moot in light of the Court's Order herein.

Accordingly,

---

[14]The defendants also argue that Bones is not liable because she did not participate in the alleged constitutional violation. (Docket #37 at 7-8); *see Zentmeyer v. Kendall County*, 220 F.2d 805, 811 (7th Cir. 2000) ("Liability under § 1983 arises only when the plaintiff can show that the defendant was personally responsible for a deprivation of a constitutional right."); *see also George v. Smith*, 507 F.3d 605, 609 (7th Cir. 2007) ("Ruling against a prisoner on an administrative complaint does not cause or contribute to the violation."). However, as Bones is immune from suit under the doctrine of qualified immunity, the Court need not address her underlying liability in the first instance. *Pearson*, 555 U.S. at 236.

IT IS ORDERED that the plaintiff's Motion for Summary Judgment (Docket #27) be and the same is hereby GRANTED in part with respect to his claim for injunctive relief against Kemper;

IT IS FURTHER ORDERED that the plaintiff's Motion for Summary Judgment (Docket #27) be and the same is hereby DENIED in part with respect to his claim for money damages against the defendants;

IT IS FURTHER ORDERED that, as the defendants are entitled to qualified immunity with respect to Reed's claims for money damages against the defendants, this action be and the same is hereby DISMISSED on its merits together with costs as taxed by the clerk of the court;

IT IS FURTHER ORDERED that the plaintiff's Motion for Default Judgment (Docket #42) be and the same is hereby DENIED as moot;

IT IS FURTHER ORDERED that the plaintiff's Motion in Limine (Docket #49) be and the same is hereby DENIED as moot;

IT IS FURTHER ORDERED that the plaintiff's Motion for a Final Pretrial Conference (Docket #50) be and the same is hereby DENIED as moot; and

IT IS FURTHER ORDERED that the plaintiff's Motion for a Writ of Habeas Corpus Testificandum and Order (Docket #53) be and the same is hereby DENIED as moot.

The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 17th day of December, 2015.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge